# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| | : | |
| | : | **10 Cr. 147 (SLT)** |
| | : | |
| -against- | : | |
| | : | |
| | : | |
| LOUIS ROMEO, | : | |
| | : | |
| DEFENDANT. | : | **DECEMBER 23, 2013** |

## DEFENDANT'S SENTENCING MEMORANDUM

### I.    Introduction

This Memorandum is submitted on behalf of Louis Romeo, who is awaiting sentencing by this Court.  On August 23, 2013, pursuant to a written plea agreement, Mr. Romeo admitted to and accepted responsibility for his involvement in the misdemeanor of  conspiracy to steal money from the United States Department of Housing and Urban Development, in violation of *18 U.S.C. § 371 & 641*.

Mr. Romeo is scheduled to be sentenced on January 10, 2014, and this letter is submitted to provide information to assist the Court in fashioning a sentence "sufficient but not greater than necessary" to achieve the statutory purposes of punishment, as required by *18 U.S.C. § 3553(a)* in light of *United States v. Booker*, 543 U.S. 220 (2005) and its progeny.

Here, Mr. Romeo respectfully requests that the Court consider several important circumstances of this case in fashioning a sentence.  First and most importantly,  we ask this Court to take into consideration Mr. Romeo's background and numerous good character traits, as

detailed in the attached letters [**Defendant's Exhibit A**] and the Presentence Investigation Report ("PSR").   Further, we ask that your Honor take into account Mr. Romeo's family life, employment history and physical and emotional health when fashioning the appropriate sentence.

We respectfully submit that these circumstances warrant a sentence substantially below the minimum sentences applicable to this case.  We, therefore, urge Your Honor to impose a sentence of probation, an appropriate sentence satisfying the  objectives embodied in *Booker* and *§ 3553(a)*.

**II.    Application of the Section 3553(a) Factors Call for a**
**Sentence below the Sentencing Guidelines Range**

A court "shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of the Guidelines. *18 U.S.C. § 3553(a)*. The Guidelines range is the "starting point and the initial benchmark." *United States v. Johnson, 567 F.3d 40, 51 (2d Cir. 2009) (quoting Gall v. United States, 552 U.S. 38 (2007)).* "A district court is authorized to depart from a Guidelines range if the court finds that 'there exists an aggravating or mitigation circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.'" *United States v. Juvenile Male Po, 466 Fed. Appx. 14, 15 (2d Cir. 2012) (summary order) (citing 18 U.S.C. § 3553(b)).*

The Court, however, is to consider:

> (1)  the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2)  the need for the sentence imposed —
>
>> (A) to reflect the seriousness of the offense, to promote  respect for the law, and to provide just punishment for the offense;

2

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for —

(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . . ;

(5) any pertinent policy statement . . . [issued by the Sentencing Commission];

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

*United States v. Boykins-Jenkins, 09 Cr. 861-01, 2011 U.S. Dist LEXIS 107255, at * 2 (S.D.N.Y. Sept. 22, 2011) (quoting 18 U.S.C. § 3553(a))*. The defense respectfully submits that a below-Guidelines sentence is appropriate here.

A.      **Personal Characteristics**

*"He just wanted to work . . . [he] agreed to give the kickback because he wanted to work, he needed to work."* **See PSR, page 24, paragraph 92, emphasis added**.  This statement, made by Mr. Romeo's wife to United States Probation, sums up how Mr. Romeo ended up in the instant predicament.  Indeed, Mr. Romeo is a mild-mannered and soft-spoken 48-year-old-man, who, with the exception of the present conviction, has had an otherwise exemplary, hard-working and law abiding life with an extraordinary history of employment and

3

devotion to his family.

Louis Romeo has emerged from a dysfunctional family environment, enduring the physical and emotional abuse of his father, to become a caring husband, father and son.  Today, Louis resides in Staten Island, New York, with his wife and three children and was gainfully employed until a recent work-related accident.

A close review of Louis Romeo's life reveals that his criminal conduct in this case is truly aberrant and the likelihood of any future criminal conduct by him is virtually non-existent.

1.      **Mr. Romeo's Background and Family**

Louis Romeo was born in 1965, in Brooklyn, New York, to the marital union of union of Victoria and Joseph Romeo.  He is oldest of two children born to his biological parents.[1]  The first seven years of Louis's life were endured in an extremely abusive environment.   Indeed, until the age of seven when his parents separated, Mr. Romeo was present and witnessed his father's repeated assaults on his mother.  Louis was also a victim of this violence and recalls beatings that caused his mother to keep him home from school to hide the bumps and bruises inflicted by his father.

After his parents separated, Louis moved with his mother and sister into the home of his maternal grandparents in Brooklyn.  Since his mother suffered from severe epilepsy, she was unable to work or obtain a driver's license.  Consequently, the family was forced to live rent-free in his grandparents' basement apartment and relied on child support payments of $65.00 per week for food and clothing.  Meanwhile, his mother's severe epilepsy resulted in frequent seizures and numerous hospitalizations.

---

[1] Mr. Romeo has four siblings; Melissa (age 42), Dara (age 30), Michael (age 28), and Kimberly (age 26).  Only he and Melissa share the same biological parents.  His three youngest siblings are the product of his father and two subsequent wives.

2.      **Mr. Romeo's Employment**

Although the PSR documents a work history dating back to 1983 when he was seventeen years old, Mr. Romeo began working when he was fourteen years old and paid rent to his mother with his earnings.  From the ages of fourteen to seventeen, while attending school, he worked at a Carvel Ice Cream store, local bagel stores and gas stations.  During this period of his life, his mother, in addition to suffering from epilepsy, developed mental illness and became a religious fanatic.  Louis would return home to find his mother destroying his record albums and other items that he saved his money to buy.  She would claim that these items were the product of the devil.

As a result, Louis moved into his father's Staten Island home when he was sixteen. Although the physical abuse ended, the emotional abuse continued.  While attending high school, Louis helped his father build three photography studios, often working late into the evening on school nights.  He was paid nothing by his father.  Ultimately, when he was seventeen, he was forced to leave school so that he could contribute financially to the family.  He was forced to "drop-out" before earning a high school diploma, despite being a good student.

### Employment After High School

At the age of seventeen, Louis Romeo began full time employment as a plumber's assistant at Mackler Plumbing in Brooklyn.  He commuted to work using public transportation, taking three buses each way.  He worked at Mackler from 1983 to 1984.

In 1984, he went to work for Richmond Plumbing in Staten Island as a full-time plumber. While employed at Richmond Plumbing he married his wife and, at about that same time, took on a second job at Dacey's Collision Shop in Staten Island, working evenings repairing cars.

In 1986, Louis Romeo went to work at the Trump Condominiums in Staten Island.  After

5

only six months, he attained the position of building superintendent.  In that position, in addition to his salary, he and his wife were given a rent-free apartment and health care benefits.  However, after a short time with Trump, he was pressured by his father to quit and to work for Romeo Contracting, his father's general contracting company.

After two months at his father's contracting company, Louis was laid-off by his own father.  At that time, one of the tenants of a two-family home owned by Louis's father lost his job and would be unable to pay rent.  Rather than losing this rental income, this man was hired to replace Louis.

Louis returned to his jobs at Richmond Plumbing during the day and at Dacey's Collision at night, where he was recognized as a talented "body and fender" repairman.  When he was twenty-two years old, he was solicited to become part owner of Stardust Collision in Staten Island.  He left both of his jobs to become a partner in Stardust.  However, after a few months there, the business was forced to close after some local "competitors" vandalized the shop and beat-up its employees.  Fortunately, his position at Dacey's remained open and he returned there for roughly two years.

In 1990, Louis was again pressured to come to work for his father.  Louis's father was now running a photography business and Louis was brought in to run the video end of that business. He remained there until 1993.

In 1993, Louis and his wife were expecting their first child and his father refused to provide his employee/son with health care insurance.  Louis Romeo left his father's photography business and entered the private sanitation industry as a driver for Baretti Carting.  He remained with Baretti and its successors, U.S.A. Carting and Waste Management, until 2000, when he was made a business agent for Teamsters Local 813.

6

In 2002, Louis Romeo was elected to the position of officer with Teamsters Local 813. In 2006, after managing a seventeen-week strike for his union members, he returned to private carting as an employee for Gaeta Sanitation in Staten Island.

In 2008, he purchased a stake in State Haulers, a company that removed waste from construction sites.   Shortly after investing his life savings to become a partner in this business, Louis learned that the company had been "black balled" in the industry.   No demolition companies or contractors were doing business with State Haulers and the company was nearing collapse.   Mr. Romeo then met Steve Marcus, the owner of several hauling companies, who offered to subcontract some of his work to Romeo's company.

In late 2008, State Haulers ceased operations and Mr. Romeo continued in the hauling business,  opening JVE Corp.  He continuing with his business relationship with Steven Marcus while running JVE.

Since his arrest in this case, Mr. Romeo has left the hauling industry.  He now supports his family through his employment with American Rolling Door, where he works as both a salesman and an installer, when needed.   He remains married to Charisse Romeo, his wife of more than twenty-five years.  They enjoy a very supportive and loving relationship.  They have three children: Joseph (age 21) and Victor (age 18),  full-time students at the College of Staten Island, and; Elizabeth (age 14), who is in high school.

The Romeo family resides in a small single family home in Staten Island.  Louis Romeo is the principal financial provider for the family.  In additional to mortgage, utility, car and food bills, Louis pays substantial amount of money in tuition.  Furthermore, his elderly mother, who continues to battle epilepsy and mental illness, depends heavily on Louis.   Mr. Romeo makes certain to pay every bill that his mother and his ninety-nine-year-old grandmother receive.  He is

also responsible for ensuring that his mother makes all of her doctor's appointments, fills all of her prescriptions and gets to the hospital when necessary.

### 3.     Mr. Romeo's Age and Physical & Emotional Health

On January 4, 2013, Mr. Romeo was involved in a work-related accident and suffered injuries to his right eye, laceration under his right eye, a broken nose, two slipped discs in his back, nerve damage in his left arm and a torn meniscus in his left knee.  He was briefly hospitalized and is currently under a physician's care for these injuries (PSR, p. 25, ¶ 95).  In addition, as a result of this accident and his injuries, Mr. Romeo became depressed and sought psychological counseling.

While "[a]ge . . . is not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range." *Guidelines § 5H1.1* (Policy Statement), the Sentencing Reform Act provides that the Sentencing Commission "shall consider whether" various factors, including a defendant's physical condition, "have any relevance" to the "imposition of [a] sentence[] of . . . imprisonment," and that it "shall take th[ose factors] into account only to the extent that they do have relevance." *28 U.S.C. § 994(d)(5)*; *see United States v. Cutler, 520 F.3d 136 (2d. Cir. 2008)*.

Further, the Guidelines provide that "physical condition . . . is not *ordinarily* relevant in determining whether a sentence should be outside the applicable guideline range." *U.S.S.G. § 5H1.4* (emphasis added).  However, as with other such "discouraged" grounds for departure, a departure is permitted for physical impairment where such a factor is present "to an exceptional degree." *United States v. Koon, 518 U.S. 81, 95-96 (1996)*.  Indeed, *§ 5H1.4* expressly recognizes that "an extraordinary physical impairment may be a reason to impose a sentence below the applicable guideline range. state that a defendant's "[p]hysical condition . . . is not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range,"

8

*Guidelines § 5H1.4* (Policy Statement). It is often relevant, though not always controlling, whether the United States Bureau of Prisons ("BOP") can provide adequate care. *See United States v. Jimenez, 212 F.Supp 2d 214 (S.D.N.Y. 2002).*

This case is truly extraordinary. Since his arrest, his physical and emotional condition has worsened. Indeed, his arrest here and the subsequent physical and psychological problems have left him literally a different person than the one who committed the crimes charged here. He is mentally and physically weaker, and constitutes significantly less of a threat of law violation, than was the case previously.

Mr. Romeo's incarceration would be far more difficult than that of a younger, stronger and an emotionally more stable person. In order to successfully cope with his eye, back and knee problems, he must see a doctor on a regular basis. Indeed, despite federal authorities' concern for prisoners' welfare, an extended period of incarceration is likely to be detrimental to Mr. Romeo's health, resulting in a lessening of his present life expectancy.

What makes a physical impairment "extraordinary" for purposes of the Guidelines--as *§ 5H1.4* makes express in this instance--is whether it is an exceptional condition, of a type or to a degree not contemplated by the Commission in ruling that the normal variations of health and physical fitness among criminals are not ordinarily relevant to sentencing, whose severity bears in some way on the justifications for punishment. *See United States v. Jimenez, 212 F.Supp. 2d at 219.*

In this case it is apparent that the defendant's condition meets that standard. First, there is no question that Mr. Romeo's physical condition is "exceptional," *Koon, 518 U.S. at 95*, and that he is "seriously infirm," *U.S.S.G. § 5H1.4*. His present health concerns are not relatively easily-controllable medical conditions. In addition, Mr. Romeo's condition seriously erodes his capacity

9

to threaten society.   It is hard to imagine Mr. Romeo committing any crimes in his present condition.   Indeed, it is difficult to imagine a 48 year old man with assorted medical ailments, having the physical and mental capacity to commit additional crimes.

Accordingly, as *§ 5H1.4* teaches, this is a case where imprisonment, which would otherwise be justified to protect the public, is wasteful and unnecessary. This brings us to the question of the extent of this Court's variance.   Beyond question, some portion of the prison sentence recommended by the Guidelines in this case is based on rationales of incapacitation and special deterrence.   These rationales are inapplicable here since Mr. Romeo is radically less likely to commit further crimes than the typical person and, accordingly, the sentence should be reduced. Such a sentence is more than sufficient to carry out the goals of sentencing, to vindicate the law and provide deterrence.   The sentence provided for in the guidelines, is not appropriate in this case, given the defendant's age and physical and mental infirmities.

### 4.        Extraordinary Family Circumstances

*Section 5H1.6 of the Guidelines*[2]  permits the court in extraordinary circumstances to consider family ties and responsibilities within the context of a downward departure. *See United States v. Johnson, 964 F.2d 124, 129 (2d Cir. 1992)* ("if the Commission had intended an absolute rule that family circumstances may never be taken into account in any way, it would have said so."); *United States v. Sharpsteen, 913 F.2d 59, 63 (2d Cir. 1990)* ("The clear implication of *section 5H1.6*  is that if the court finds the circumstances related to family ties and relationships are extraordinary, it is not precluded as a matter of law from taking them into account in making a downward departure."); *United States v. Galante, 111 F.3d 1029, 1034 (2d Cir.1997)*.  Courts have granted downward departures or non-guideline sentences where "incarceration in accordance with

---

[2]  *Section 5H1.6* provides that "family ties and responsibilities ... are not *ordinarily* relevant in determining whether a sentence should be outside the applicable guideline range." *U.S.S.G. § 5H1.6*

the Guidelines might well result in the destruction of an otherwise strong family unit." *United States v. Alba, 933 F.2d 1117, 1122 (2d Cir. 1991)*; see *also United States v. Hon, 1989 U.S. Dist. LEXIS 5987* (S.D.N.Y. May 31, 1989) (considering, in downward departure from Guidelines, that the defendant "is the mother of a young child ... and [has] a close-knit extended family").

   The intended beneficiary of a family circumstances departure or non-guideline sentence is not the defendant but his dependents. *See  Johnson, 964 F.2d at 129* ("The rationale for a downward departure here is not that [defendant's] family circumstances decrease [his] culpability, but that we are reluctant to wreak extraordinary destruction on dependents who rely solely on the defendant for their upbringing."). Sentencing courts must therefore focus on the vulnerability of these dependents, assessing the hardships that a sentence of incarceration would impose on them. Accordingly, courts have granted departures on this ground where it is clearly established that the defendant is a *unique* source of financial and/or emotional support for a significant number of dependents. *See, e.g.,  United States v. Faria, 161 F.3d 761, 762 (2d Cir. 1998)* ("We have upheld downward departures based on family circumstances 'where the family was uniquely dependent on the defendant's ability to maintain existing financial and emotional commitments.'") (quoting *United States v. Sprei, 145 F.3d 528, 535 (2d Cir. 1998))*; *United States v. Galante, 111 F.3d 1029, 1037 (2d Cir. 1997)*.

   In this case, Mr. Romeo respectfully requests that Your Honor consider his extraordinary family circumstances when fashioning an appropriate sentence.  Although Mr. Romeo  is not a single parent, his family circumstances are truly extraordinary.  As set forth in the PSR, Mr. Romeo currently resides with and financially supports his wife and three (3) children.  A prison sentence will jeopardize Mr. Romeo's ability to maintain the family residence and for his sons to continue with their college educations.  Further, his incarceration will prevent him from caring for his sick mother and his grandmother.

   The facts of this case fall within the parameters of other cases in which the Second Circuit

has upheld non-guideline sentences for extraordinary family circumstances. *See United States v. Galante, 111 F.3d 1029, 1035 (2d Cir. 1997)* (upholding departure where defendant supported two children and where defendant's wife earned less than half defendant's income); *Johnson, 964 F.2d at 129-30* (upholding departure where defendant was "solely responsible for the upbringing of her three young children, including an infant, and of the young child of her institutionalized daughter"); *United States v. Alba, 933 F.2d 1117, 1122 (2d Cir. 1991)* (upholding departure where defendant supported his wife, two daughters, disabled father, and grandmother); *cf. United States v. Smith, 331 F.3d 292, 293-94 (2d Cir. 2002)* (reversing departure where defendant's employed wife could support defendant's son and where defendant's mother lived nearby to assist with childcare).

To confirm that parental responsibilities can be extraordinary, this Court need look no further than the circumstances faced by Mr. Romeo.

### 5.     The Criminal Charges & Conviction

Mr. Romeo engaged was charged in a kick-back scheme from June 2009 through February 2010. The government investigation revealed that Mr. Romeo was approached by others and induced to participate in the scheme.

By all accounts, Louis Romeo's involvement in this offense truly represents aberrant conduct for an individual who has had a remarkable life of hard work and commitment to his family.   As stated above, Louis Romeo's work ethic and determination began during his formative years growing up in Brooklyn and Staten Island.    Rather than join a street gang or commit crimes, Louis Romeo began working at the age of fourteen.    Rather than prey upon others, Louis has worked continuously to contribute to his family.

A close and meaningful review of the circumstances that have impacted Louis Romeo, reveal that he is a man capable of redemption whose likelihood of future criminal conduct is

absolutely remote.  Louis Romeo overcame a dysfunctional family environment, the powerful and dangerous influences and trappings of his community, which have served to derail the lives of many of the offenders prosecuted by the Department of Justice in the EDNY and SDNY. Although he never finished high school or attended college, he equipped himself with training and skills to become a productive member of our society.

Today, Louis Romeo is a devoted husband, father, son and grandson.  Despite growing up in an abusive and tumultuous environment, he is a kind, gentle and doting husband and father. Through his extraordinary commitment to his family and work, Louis has forged a positive life path for himself and his family.   His weekly donations to St. Ann's Catholic Church in Staten Island have been recognized by the placement of his name on the church's wall.  The only deviation from this path was his involvement in this offense.

**B.**     **A Below Guidelines Sentence is Appropriate**

Mr. Romeo recognizes the seriousness of his crimes and accepts responsibility for them. His guilty plea shows that acceptance. Based on Mr. Romeo's background and intelligence, it is surprising that he finds himself in this predicament.  But, as noted above, his proven desire to re-establish himself as an law abiding member of society and as a role model for his children, warrant the imposition of a sentence significantly less than the sentence range provided by the sentencing guidelines..

**III.**  **Conclusion**

For the reasons set forth above, the defense respectfully requests that this Court impose a sentence that does not include incarceration, which is "sufficient, but not greater than necessary" to comply with the goals set forth in *18 U.S.C. § 3553(a)(2)*.

Dated: Bronx, New York
December 23, 2013

_____
**Mark S. DeMarco, Esq.**
Attorney for Defendant
***Louis Romeo***
2027 Williamsbridge Road
Bronx, NY 10461
(718) 239-7070

TO:    CLERK OF THE COURT
        United States District Court
        Eastern District of New York
        225 Cadman Plaza East
        Brooklyn, NY 11201

        HON. SANDRA L. TOWNES
        United States District Court
        Eastern District of New York
        225 Cadman Plaza East
        Brooklyn, NY 11201

        Allon Lifshitz, Esq.
        Assistant United States Attorney
        Office of the United States Attorney

        Mr. Louis Romeo

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 23, 2013, I served copy of the foregoing memorandum

by electronic mailing same to:

Allon Lifshitz, Esq.
Office of the United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, NY 11201

 

                                        Mark S. DeMarco
                                        2027 Williamsbridge Road
                                        Bronx, NY 10461
                                        718-239-7070